UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION - BAY CITY

IN RE:

|  |  |
|---|---|
| CONRAD CARMONA, SR., | Case No. 08-20783-dob |
|  | Chapter 7 Proceeding |
| Debtor. | Hon. Daniel S. Opperman |

_____/

LINDA J. MORRISON, VANESSA ANN GOMEZ,

      Plaintiffs,

v.                                    Adversary Proceeding
                                            Case No. 08-2075-dob

CONRAD CARMONA, SR.,

      Defendant.

_____/

## OPINION ON COMPLAINT TO DECLARE DEBT NON-DISCHARGEABLE UNDER 11 U.S.C. § 523 (A)(6)

Plaintiffs Linda J. Morrison and Vanessa Ann Gomez commenced this adversary proceeding seeking to declare pre-petition state court judgments against Defendant-Debtor Conrad Carmona, Sr., entered after the parties accepted a case evaluation award under Michigan Court Rule 2.403(M)(1), non-dischargeable under 11 U.S.C. § 523(a)(6). Defendant answered the complaint and admitted that state court judgments were entered against him, but denied that the judgments sufficed to prove that he willfully and maliciously injured Plaintiffs. After the Court denied cross-motions for summary judgment on the issue of collateral estoppel, the matter proceeded to Trial on December 9, 2010. Plaintiff Gomez did not appear at Trial, and the Court granted Defendant's oral motion for summary judgment as to Plaintiff Gomez. The Court then took the matter under advisement as to Plaintiff Morrison.[1] For the following reasons, the Court

---

[1] For the balance of this Opinion, "Plaintiff" shall refer only to Plaintiff Linda J. Morrison.

1

holds Defendant's debt to Plaintiff Morrison non-dischargeable under Section 523(a)(6).

Findings of Fact

Plaintiff commenced a civil action in the Bay County Circuit Court alleging that Defendant violated MCL § 37.2103 by sexually harassing her. Plaintiff's state court complaint alleged both *quid pro* sexual harassment as well as a hostile work environment. The matter proceeded to case evaluation under MCR 2.403, and the panel recommended that Plaintiff be awarded $10,000. Both parties accepted the case evaluation award, and judgment in favor of Plaintiff was entered on March 6, 2008.

Defendant owned a restaurant known as Touch of Mexico and Plaintiff worked at Touch of Mexico from 1999 through January 28, 2007. The working relationship between Plaintiff and Defendant was at times confrontational, resulting in numerous instances where Plaintiff walked off the job or Defendant fired her. Plaintiff typically returned to work the next day or in a matter of days, either because Plaintiff asked to come back or Defendant called her to return to work.

As Plaintiff had regained custody of her son during this time, Plaintiff needed continued employment not only to provide support for them, but also as a condition of keeping custody. During this time, Defendant also received a multi-million dollar judgment from a civil lawsuit.

Overall, the atmosphere at Touch of Mexico was friendly. It was common for Plaintiff and other employees to banter and tell jokes while at work. Plaintiff and other employees discussed their dating experiences and sexual activities during work hours, and Defendant sometimes overheard these conversations.

In 2004 Defendant and his former wife separated, and their divorce was finalized in June of 2005. Prior to that divorce, Plaintiff viewed Defendant as a friend with whom she could talk about personal activities such as dates with other men. Plaintiff also sought assistance from Defendant to secure a new apartment, but Defendant was unable to help. In turn, Defendant expressed to Plaintiff that he was depressed due to his divorce.

At trial, Plaintiff testified that Defendant's sexual harassment began soon after Defendant's divorce became final. On direct examination, Plaintiff testified that Defendant grabbed her breasts and brushed his body up against her. Plaintiff described how Defendant

2

would ask about her breasts, specifically her nipple size, and pulled up her shirt and grabbed her breasts in an attempt to suck on them. Plaintiff testified this type of conduct occurred probably "15-20 times." When asked to separate the various incidents of unwanted contact, Plaintiff testified that one incident occurred when she was cleaning out an upstairs rental unit owned by Defendant. Plaintiff testified Defendant came into the unit and tried "to get his hands full" and requested oral sex. Plaintiff also testified that when she was leaned over cleaning the tub, Defendant slapped her bottom. Plaintiff told him to stop, but Defendant just walked away laughing. Plaintiff further testified that during that incident Defendant also rubbed up against her breasts and tried to grab them. In addition, Plaintiff testified Defendant locked the door to the rental unit and ensured that no one else was there.

Beyond the incident in the rental unit, Plaintiff testified that "10-15 times" Defendant grabbed her breasts in the multiple areas of the restaurant and that at least once a co-worker walked in and observed the conduct. Plaintiff testified that when Defendant touched her she "told him to stop" and "told him no." According to Plaintiff, Defendant "threatened my job all the time" by saying that if she "valued [her] job" she "would do what he asked and just shut up and do it." Plaintiff testified that what Defendant wanted her to "do" was perform oral sex. Plaintiff further testified that Defendant knew she needed the job at Touch of Mexico to pay expenses and to keep custody of her son.

The incident at issue involved oral sex. Plaintiff testified she was working the day of the incident. Although Plaintiff could not recall the exact date, she testified she read that the incident occurred in January of 2006, between 9 and 10:30 in the morning and before the restaurant opened at 11 a.m. Only Plaintiff and Defendant were in the restaurant at that time. Plaintiff had come out of the bathroom into the waitress area to find that Defendant had "pulled his sweat pants down," "exposed himself," lifted his apron and sat down. Plaintiff then testified that Defendant told her "he wanted a blow job if I was to keep my job." Plaintiff told Defendant she did not want to, but Defendant told her that if " you value your job you will do it." Plaintiff testified she "felt threatened, so I did it." Plaintiff testified that after the oral sex she vomited in the bathroom, but finished her shift.

Plaintiff testified Defendant subsequently solicited her for oral sex quite a few times. According to Plaintiff, Defendant a "couple times" forced her to put her hand on his privates. Plaintiff testified Defendant's pants were up during these incidents. Plaintiff further testified that she told Defendant she had work to do and would look for any excuse to get away. Plaintiff also testified that Defendant acknowledged to her that his conduct was not okay, that it was wrong, and it was "against God." When asked why she continued to work at Touch of Mexico after the oral sex and subsequent incidents, Plaintiff testified she could not pay her bills without the job and her son depended on her. Plaintiff testified she looked for work at 15-20 places following the oral sex episode.

Plaintiff testified that after the oral sex incident, and her subsequent refusals to engage in further oral sex, Defendant's conduct towards her changed, notably in regard to her work hours. Prior to the oral sex incident Plaintiff typically worked 25-30 hours a week and afterwards she was only working 13-14 hours a week.

During cross examination, Plaintiff testified Defendant overtly threatened her job on the day the oral sex occurred. She also reiterated that she was "positive" she suffered reduced hours. Plaintiff also clarified that leading up to the oral sex incident she had her hours cut and that Defendant promised that if she engaged in oral sex he would give her those hours back but because she subsequently refused, she suffered a reduction in hours. When asked about portions of her deposition testimony wherein she testified that there were no contemporaneous threats to her job made at the time of the oral sex, Plaintiff recanted that testimony and testified at trial that Defendant made actual threats at the time he requested oral sex. Plaintiff also recanted other deposition testimony that Defendant engaged in unwelcome sexual contact and speech while Defendant was still married explaining that she "was confused" and that conduct definitely occurred after the divorce. Finally, when Plaintiff was asked on cross examination if she told others that she was going to set up Defendant as a sexual harasser because of reports in the paper that he had won a multimillion dollar verdict, she denied saying anything of that nature. On redirect, Plaintiff testified she did not tell anyone she was setting up Defendant.

Although Plaintiff continued to work at Touch of Mexico for approximately one year

4

after January, 2006, Plaintiff was deeply depressed following the incident and sought professional help. Plaintiff did not want to get out of bed or go to work. Plaintiff also attempted suicide. Plaintiff was diagnosed as bi-polar sometime in 2009. This condition apparently existed while she was working at Touch of Mexico, but Plaintiff thought she just suffered from severe depression. Plaintiff quit working at Touch of Mexico on January 28, 2007, after she found different employment. Plaintiff testified her injuries include emotional distress, post traumatic stress disorder, as well as the state court judgment in her favor.

Plaintiff then called Defendant as a witness. On direct examination by Plaintiff, Defendant admitted engaging in oral sex with Plaintiff at the restaurant while Plaintiff was an employee. Defendant further acknowledged other incidents of physical touching, but testified those incidents were accidental. Defendant acknowledged his prior deposition testimony where he testified that the oral sex was either wrong or morally wrong. Defendant also acknowledged that he understood Plaintiff depended on her job at Touch of Mexico to meet her financial obligations.

When asked about prior testimony that the incident of oral sex was consensual, Defendant testified Plaintiff "did it voluntarily . . . because it was consensual." Defendant then reiterated that he made "no assumption" that the oral sex was voluntary, just that Plaintiff "did it voluntarily. That's how I am answering it." Defendant testified it never entered his mind that Plaintiff may feel her job was on the line if she refused. When asked if what occurred during the incident of oral sex was that Defendant wanted sex and Plaintiff gave it to him, Defendant testified he "never asked" Plaintiff for oral sex in any "forceful" way because it was "consensual."

Defendant further testified that although there was no sexual relationship outside of work, there was one instance when Defendant gave Plaintiff a ride to get her car, and to thank Defendant Plaintiff tried to caress and kiss Defendant, but Defendant "dodged" those attempts. On rebuttal, Plaintiff testified that Defendant simply gave her a ride to get her car and that there "was no hug or kiss."

After conclusion of Plaintiff's proofs, Defendant took the stand in his defense.

5

Defendant again acknowledged that the oral sex incident occurred. Defendant also testified that while there were other occasions of touching, he did not intentionally rub up against Plaintiff. Defendant denied that he reached under or pulled up Plaintiff's shirt. Defendant testified that other than the oral sex incident there was no other sexual contact. Regarding the oral sex incident specifically, Defendant testified he was in the dishwashing area as Plaintiff talked about a sexual encounter she had the previous evening. According to Defendant, Plaintiff was betting she would not go out and engage in oral sex with her boyfriend. Defendant testified he listened to this and "got excited . . . as a male . . . I just got excited." Defendant further testified that Plaintiff noticed this excitement under his apron, Plaintiff reached under his apron and rubbed his privates, and Plaintiff asked him if he wanted "a blow job." Defendant testified he "just went with it" and said "yes." Defendant denied asking Plaintiff for oral sex after this incident.

When asked if at the time of the oral sex incident he viewed Plaintiff as an employee who must do as he asked, Defendant testified he viewed it as two adults engaging in a consensual activity. Defendant denied using any force or threatening to fire Plaintiff. Defendant also testified that he never threatened Plaintiff with any financial sanction for refusing to comply with his requests either prior to or after the oral sex incident. Regarding Plaintiff's claim that Defendant reduced her hours, Defendant testified that at times business was slow and Plaintiff would ask to go early, or times where Plaintiff finished all her work and left early. Defendant testified he did not cut Plaintiff's hours after January of 2006, but he did have Plaintiff begin her shifts a half-hour later due to the slow economy.

Defendant also testified he noticed no change in Plaintiff's personality, nor any depression after the oral sex incident. He testified that he had no intent to injure Plaintiff, as it "never crossed my mind," and he never intended Plaintiff to feel threatened or suffer depression. Defendant further testified that Plaintiff had discussed prior episodes of oral sex with him and he was unaware of her suffering any injury from those episodes.

Defendant also called several supporting witnesses. The first was Mr. Joe Gledhill, a friend of Defendant's who frequently ate at Touch of Mexico. He testified he saw Plaintiff rubbing Defendant's back and overheard her saying Defendant was a good boss. Mr. Gledhill

6

never saw any flirtatious behavior or perceived anything unusual about his conversations with Plaintiff. Next to testify was Ms. Julie Scheel, an employee of Touch of Mexico on and off for 25 years. Ms. Scheel worked with Plaintiff but did not experience any sexual harassment and was not aware of any such behavior. Ms. Scheel testified she was not aware of any retaliatory conduct by Defendant, such as hours being cut. Regarding any fluctuation in Plaintiff's hours, Ms. Scheel testified Plaintiff would often call in sick but Plaintiff's hours remained the same. The final witness called by Defendant was Mr. Alfred Hill, an employee at Lucky's Pub. Mr. Hill testified Plaintiff would come into Lucky's following her shift at Touch of Mexico. Mr. Hill further testified that although Plaintiff never said anything about being sexually harassed, after Plaintiff stopped working at Touch of Mexico she told Mr. Hill she was going to get Defendant. According to Mr. Hill, Plaintiff did not give details, but was "vague" in her explanation. Mr. Hill further testified that Plaintiff said Defendant was a bad boss, which was a change because she used to refer to him as a good boss.

<u>Jurisdiction</u>

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

<u>Applicable Law</u>

Plaintiff seeks a determination that Defendant's debt to her, the state court judgment for $10,000, is non-dischargeable under Section 523(a)(6). Section 523(a)(6) authorizes a bankruptcy court to exclude a debtor from receiving a discharge "from any debt for willful and malicious injury by the debtor to another entity or the property of another entity." Exceptions to discharge are to be narrowly construed in favor of the debtor. *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S. (In re Meyers)*, 196 F.3d 622 (6th Cir. 1999)).

"'A dischargeability action under 11 U.S.C. § 523(a)(6) encompasses two distinct claims: (1) whether the debtor owes a debt to the plaintiff and (2) whether the debt owed by the debtor to the plaintiff is nondischargeable.'" *CMEA Title Agency, Inc. v. Little (In re Little)*, 335 B.R.

376, 381 (Bankr. N.D. Ohio 2005) (quoting *Mingus v. Lombardo (In re Lombardo)*, 326 B.R. 901 (B.A.P. 6th Cir. 2005) (unpublished)). Whether Defendant owes Plaintiff a debt is not an issue here. Defendant accepted the state court case evaluation award, which was subsequently reduced to a judgment. Defendant therefore is indebted to Plaintiff.

As to whether the debt is non-dischargeable, Plaintiff "must prove that (1) the debtor caused . . . her injury; (2) the debtor's actions were malicious; and (3) the debtor's actions were willful." *Jones v. Svreck (In re Jones)*, 300 B.R. 133, 139 (B.A.P. 1st Cir. 2003). As with other Section 523(a) actions, the standard of proof is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). It is well established that Plaintiff must prove that Defendant committed an injury that is both willful <u>and</u> malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). This is a heavy burden as "'[t]he willful and malicious standard is a stringent one.'" *Little*, 335 B.R. at 383 (quoting *Steier v. Best (In re Best)*, 109 Fed. App'x 1, 2004 WL 1544066, at *4 (6th Cir. June 30, 2004)).

Bankruptcy courts, "in order to find a 'willful' injury under § 523(a)(6), must determine either that (i) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result from the act." *Trantham*, 304 B.R. at 307 (B.A.P. 6th Cir. 2004) (citing *Markowitz*, 190 F.3d at 464). "Willful conduct is that conduct which is deliberate, intentional, and voluntarily undertaken by the debtor," *Oregon Ford, Inc. v. Clayburn (In re Clayburn)*, 67 B.R. 522, 525 (Bankr. N.D. Ohio 1986) (citing *Tinker v. Colwell*, 192 U.S. 473 (1904)), which is intended to cause injury, *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998) ("nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury") (emphasis in original). *See also Markowitz*, 190 F.3d at 464 (stating that *Geiger* "held that 'willful' means 'voluntary,' 'intentional,' or 'deliberate'"). "An act will be deemed 'willful' only if it was undertaken with the actual intent to cause injury." *Cash Am. Fin. Servs. v. Fox (In re Fox)*, 370 B.R. 104, 119 (B.A.P. 6th Cir. 2007) (citing *Markowitz*, 190 F.3d at 464). "To find that a debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act, it is necessary to look into the debtor's mind, subjectively." *Monsanto Co. v.*

*Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004).

"'Malice' for purposes of § 523(a)(6) means 'without just cause or excuse.'" *JGR v. Brown (In re Brown)*, 442 B.R. 585, 620 (Bankr. E.D. Mich. 2011) (quoting *Tinker v. Colwell*, 193 U.S. 473, 485-86 (1904)). "Alternately, malice has been defined as 'act[ing] in conscious disregard of [one's] duties . . . .'" *Id.* (quoting *Qui v. Zhou (In re Zhou)*, 331 B.R. 274, 277 (Bankr. E.D. Mich. 2005)). "Malicious" conduct is "conduct targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm." *Gadtke v. Bren (In re Bren)*, 284 B.R. 681, 699 (Bankr. D. Minn. 2002) (citations omitted). Stated slightly differently, a malicious injury "is: '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Little*, 335 B.R. at 384 (quoting *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005)). Some courts also emphasize that "[t]here must also be a consciousness of wrongdoing. It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6)." *ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001) (citations omitted). "In the sexual harassment context, a determination that sexual harassment has occurred has widely been held to constitute malice." *Sells v. Porter (In re Porter)*, 363 B.R. 78, 90 (Bankr. E.D. Ark. 2007) (citation omitted).

"Debts arising out of these types of misconduct satisfy the willful and malicious injury standard: intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing the creditor's premises." *In re Best*, 109 Fed. App'x 1, 2004 WL 1544066, at *54 (collecting cases). "Negligent or reckless acts . . . do not suffice to establish that a resulting injury is 'willful and malicious.'" *Geiger*, 523 U.S. at 64 (citation omitted). In addition, because "a debtor will rarely, if ever, admit to acting in a willful and malicious manner for purposes of § 523(a)(6), both requirements can be inferred through the circumstances surrounding the injury at issue." *O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000) (citations omitted).

<u>Analysis</u>

The applicable law requires Plaintiff to prove by the preponderance of the evidence an

9

injury caused by Defendant's willful and a malicious conduct. Here, the underlying complained of injury is that Defendant sexually harassed Plaintiff. The Court will first determine whether Plaintiff has proven an injury caused by Defendant. Then the Court will examine whether the testimony supports finding an actionable violation of the Elliot Larson Civil Rights Act ("ELCRA"). Finally, the Court will address whether the testimony and evidence demonstrates that Defendant acted both willfully and maliciously.

*Defendant injured Plaintiff*

Plaintiff testified that she suffered emotional distress, depression, and post-traumatic stress disorder, as well as attempting suicide as a result of Defendant's alleged conduct. Plaintiff also testified she suffered financial injury in the form of reduced hours. In his post-trial brief, Defendant does not dispute most of these injuries. Defendant does argue, however, that there is no evidence the post-traumatic stress disorder resulted from his actions. Defendant's overall argument is he could not have "predict[ed] that one event of oral sex . . . would result in the dramatic injuries" Plaintiff testified she suffered.

To fall under Section 523(a)(6), "[t]he injury sustained must be an invasion of [Plaintiff's] legal rights." *In re Little*, 335 B.R. at 384 (citation omitted). Here, Plaintiff claimed injury from *quid pro quo* and hostile work environment sexual harassment, and, as explained below, the Court finds an actionable claim of sexual harassment against Defendant. Other courts have found, with little discussion, that violations of sexual harassment statutes suffice to show an injury for purposes of Section 523(a)(6). *McDonough v. Smith (In re Smith)*, 270 B.R. 544, 549 (Bankr. D. Mass. 2001) (state court quid pro quo and hostile work environment judgment satisfied injury requirement of Section 523(a)(6) because plaintiff "had right to be free from sexual harassment"); *Johnson v. Myers*, No. 10-1731, 2010 WL 3362346, at *2 (Bankr. D.N.J. August 23, 2010) (letter opinion) (citing *Porter*, 539 F.3d at 894) ("an employee who suffers the loss of the legal right to be free from sexual harassment suffers a legally cognizable injury").

Moreover, to the extent Defendant argues that the post-traumatic stress disorder did not result from his actions or that the "dramatic" nature of the injuries was unexpected, Michigan law provides that Defendant takes Plaintiff as he finds her, including any pre-existing conditions.

10

*Wilkinson v. Lee*, 617 N.W.2d 305, 309 (Mich. 2000) ("Established principles require that the defendants take the plaintiff as he was, with his susceptibility to injury resulting from [pre-existing] his brain tumor."). This "applies not only where the peculiar physical condition which makes the others injuries greater than the actor expected is not known to him, but also . . . where it is unknown to the person suffering it or to anyone else until after the harm is sustained." *Id.* (citation omitted). The events in Plaintiff's past are relevant only to the extent they made Plaintiff more susceptible or vulnerable to the injuries caused by Defendant. Under Michigan law, any "aggravation or triggering of a preexisting condition can constitute a compensable injury." *Fisher v. Blakenship*, 777 N.W.2d 469, 476 (Mich. Ct. App. 2009) (citing *Wilkinson*). Thus, the Court finds Plaintiff has met her burden of showing an injury, that is the invasion of a legally protected right to be free from sexual harassment.

*Defendant's conduct constitutes an actionable claim of sexual harassment under the ELCRA*

The nature of Plaintiff's complained of injury is sexual harassment under the ELCRA. Whether Defendant's conduct amounts to sexual harassment is important because, as noted earlier, "a determination that sexual harassment has occurred has widely been held to constitute malice." *In re Porter*, 363 B.R. at 90. The sexual harassment can be a violation of either state law, *Erickson v. Halverson (In re Halverson)*, 226 B.R. 22 (Bankr. D. Minn. 1998) (finding sexual assault and battery amounting to sexual harassment under state law), or Title VII of the federal Civil Rights Act of 1964, *Sanger v. Busch (In re Busch)*, 311 B.R. 657 (Bankr. N.D.N.Y. 2004) (analyzing whether *quid pro quo* or hostile work environment claims under 42 U.S.C. § 2000e-2(a)(1), as amended by Civil Rights Act of 1991, sufficed to meet elements of Section 523(a)(6)).

Plaintiff's state court complaint alleged that Defendant's conduct amounted to *quid pro quo* sexual harassment and created a hostile work environment under the ELCRA. The trial testimony covered both *quid pro quo* and hostile work environment sexual harassment. Michigan's sexual harassment statute is "specifically designed to outlaw" both types of sexual harassment. *Champion v. Nationwide Sec., Inc.*, 545 N.W.2d 596, 599 (Mich. 1996) (citation omitted). Section 37.2103(i) of the ELCRA states, in relevant part, that

11

(i) Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions: . . .

> (*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment.

> (*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment ... or creating an intimidating, hostile, or offensive employment ... environment.

*Quid pro quo* sexual harassment falls under MCL § 37.2103(i)(*ii*), *id.*, while § 37.2013(i)(*iii*) covers hostile work environment claims, *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000) (citation omitted).

"Quid pro quo harassment is that which requires that the employee either accede to sexual demands or forfeit job benefits and perks or otherwise be subject to less favorable working conditions." *McCallum v. Dep't of Corr.*, 496 N.W.2d 361, 365 (Mich. Ct. App. 1992)). "In order to establish a claim of quid pro quo harassment" under Michigan law, Plaintiff

> must, by a preponderance of the evidence, demonstrate:
> (1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment.

*Chambers,* 614 N.W.2d at 915 (citation omitted). The Court notes that it is well established that although Michigan courts are not "compelled to follow federal precedent or guidelines in interpreting Michigan law," they have and continue to "turn to federal precedent for guidance in reaching [a] decision." *Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993).

The first element that Plaintiff must prove is that she was subject to unwelcome sexual conduct or communication by Defendant. "The threshold for determining that conduct is unwelcome is that the employee did not solicit or incite it, and the employee regarded the conduct as undesirable or offensive." *Radtke*, 501 N.W.2d at 163 (citation omitted and internal quotation marks omitted). "'The correct inquiry is whether [plaintiff] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual

12

intercourse was voluntary.'" *Diepenhorst v. Battle Creek*, No. 1:05-CV-734, 2007 WL 1141492, at *5 (W.D. Mich. Apr. 17, 2007) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) in a *quid pro quo* case under ELCRA). Plaintiff testified to numerous instances where Defendant grabbed her breasts, lifted her shirt, told her he wanted to suck on her breasts, slapped her buttocks, and asked her for oral sex. At a bare minimum, this testimony shows that Defendant's conduct was unwelcome because he invited Plaintiff to engage in sexual activity. *Plumb*, 60 F. Supp. 2d at 649 (lack of evidence that defendant invited plaintiff to engage in sexual activity).

Defendant's testimony, in contrast, is basically devoid of any indications that Plaintiff solicited or otherwise incited the majority of this conduct and communication. The only testimony in this regard is Defendant's contention that Plaintiff "instigated" the oral sex episode by reaching under his apron or otherwise voluntarily participated in or consented to oral sex. Even assuming Plaintiff participated voluntarily in the oral sex, Plaintiff's testimony plainly establishes that the oral sex was not consensual, in the sense of willing participation or mutual interest; rather, she acquiesced to keep her position. Moreover, neither voluntariness or consent is a defense to sexual harassment, but is only relevant as to "whether sexual advances are unwelcome." *Gebers v. Commercial Data Center Inc.*, 47 F.3d 1168, 1995 WL 9262, at * 2 (6th Cir. 1995)) (Table) (citing *Vinson*, 477 U.S. at 69). However, under Michigan law, consent in this context means examining whether the plaintiff engaged in the same type of conduct complained of, *Pena v. Ingham Cnty. Rd. Comm'n*, 660 N.W.2d 351, 355-56 (Mich. Ct. App. 2003), and no such evidence exists here. Therefore, the evidence supports a finding that Plaintiff was subject to unwelcome sexual conduct and communication.

The second element requires a determination of whether Plaintiff, by virtue of her rejection of Defendant's subsequent requests for oral sex, "was subjected to an adverse employment action." *Plumb v. Abbott Laboratories*, 60 F. Supp. 2d 642, 650 (E.D. Mich. 1999) (citing *Champion*, 545 N.W.2d at 650). The *Plumb* court noted that the ELCRA does not define what qualifies as an "'adverse employment action.'" *Id.* While "[t]he classical example of quid pro quo harassment is the situation in which the plaintiff is fired because of a refusal to succumb

13

to sexual demands[,]" if the plaintiff "involuntarily resigns in order to escape an employment situation made intolerable because of sexual harassment, the termination of employment is considered a constructive discharge or firing." *McCalla v. Ellis*, 446 N.W.2d 904, 378 (Mich. Ct. App. 1989) (citation omitted); *Champion*, 545 N.W.2d at 600 ("[T]he law does not differentiate between employees who are actually discharged and those whose are constructively discharged."). The *Plumb* court observed that "Michigan courts have generally limited quid pro quo harassment to cases involving constructive discharge." *Id*. (collecting cases). "[A] constructive discharge occurs only where an employer['s] . . . conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Champion*, 545 N.W.2d at 650 (citations omitted). The *Plumb* court also looked to Title VII case law for the propositions that "'a significant change in employment status,'" *Plumb*, 60 F. Supp. 2d at 650 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)), or conduct "which compels an employee to elect between acceding to sexual demands and forfeiting . . . continued employment . . . or otherwise suffering tangible job detriments[,]" *id*. (quoting *Highlander v. KFC Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986)), meet this requirement.

The adverse employment action alleged here is constructive discharge. Plaintiff testified that following the oral sex episode she suffered a reduction in the number of hours she worked because she refused subsequent requests for oral sex and this, in conjunction with the sexual harassment, forced her to resign and find work elsewhere. Plaintiff claimed her hours were cut from 25-30 hours to only 13-14 hours a week. Plaintiff also testified that Defendant forced her to touch his privates more than once and that she had to arrange for co-workers to interrupt and call Plaintiff to the kitchen when she was alone with Defendant.

Defendant, on the other hand, testified that any reduction in Plaintiff's hours was not because she refused to engage in oral sex. He testified either slow business forced him to close for a few hours in the afternoon or open later in the morning, or because Plaintiff completed her work and requested to leave early. Ms. Scheel also testified on Defendant's behalf that Plaintiff's hours remained the same. However, that Court notes that in 2006 Ms. Scheel either worked limited evenings or days as needed or, after September of 2006, only worked Friday

14

nights and weekends.  Plaintiff, on the other hand, worked the morning prep shift.  It is quite likely then that Ms. Scheel may not have noticed any reduction in Plaintiff's hours.

Overall, the Court finds that Plaintiff was constructively discharged.  Even though there is some dispute over whether Defendant cut Plaintiff's hours or whether any reduction was a by product of economic forces, the uncontradicted testimony by Plaintiff of continuing sexual harassment demonstrates that Defendant effectively forced Plaintiff to resign.  Any delay between the oral sex episode and Plaintiff's actual resignation is irrelevant in light of Plaintiff's testimony that she tried unsuccessfully to obtain alternate employment at numerous establishments.  The Court finds that to the degree that Defendant claimed economic factors as a reason for why he closed the restaurant at times, the length of time it took Plaintiff to secure another position likewise was dependent on those same economic factors.  Moreover, it is undisputed that Plaintiff needed some type of employment to maintain custody of her son; therefore, it is reasonable that she would stay, albeit unwilling, at Touch of Mexico until she secured new employment.  The Court finds that Defendant's conduct was severe to a degree that a reasonable person in Plaintiff's position would feel compelled to quit.  *Champion*, 545 N.W.2d at 650.  Plaintiff suffered "an adverse employment action" because she suffered a tangible job detriment in the form of reduced hours, had to chose to accede to the demand for oral sex in order to keep employment so she could maintain custody of her son, and was subject to continued solicitation for oral sex and unwelcome sexual contact.  Therefore, Plaintiff was constructively discharged.  The Court holds the testimony and evidence demonstrates that Defendant's conduct amounted to an actionable claim of *quid pro quo* sexual harassment.

In reaching this conclusion, the Court, after listening to the testimony of Plaintiff and Defendant and closely watching their demeanor while answering questions, finds that Plaintiff is more credible than Defendant.

Turning next to the hostile work environment claim, to make out a prima facie claim Plaintiff must prove that:

(1) [she] belonged to a protected group;
(2) [she] was subjected to communication or conduct on the basis of sex;
(3) [she] was subjected to unwelcome sexual conduct or communication;

> (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
> (5) respondeat superior.

*Chambers*, 614 N.W.2d at 915 (citation omitted). The first three elements have already been discussed and clearly are met here. Plaintiff belongs to a protected class, *Radtke,* 501 N.W.2d at 162 ("all employees are inherently members of a protected class"), and the harassment was based on her sex because "but for the fact of her sex, she would not have been the object of harassment," *id*. at 163 (citation and internal quotes omitted). Here, "but for [Plaintiff's] womanhood," *id*., Defendant would not have slapped her buttocks, grabbed her breasts multiple times, or solicited oral sex. The unwelcome nature of the sexual conduct and communication by Defendant is also without question, as Plaintiff "did not solicit or incite" the conduct and communicated it was "undesirable and offensive." *Id*. (citation and internal quotes omitted). In addition, the respondeat superior element is met because Plaintiff alleged Defendant, who testified he solely owned Touch of Mexico, perpetrated the harassment. "[I]f an employer is accused of sexual harassment, then the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair." *Id*. at 168-69. Thus, the only element at issue is the fourth, the existence of hostile work environment.

"[W]hether a hostile work environment exist[s] shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Id*. at 167. In contrast to *quid pro quo* sexual harassment, "a loss of a tangible job benefit is not necessary" to prove hostile work environment. *Id*. at 163 (citation and internal quotes omitted). When making this determination, factors considered are "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Quinto v. Cross and Peters Co.*, 547 N.W.2d 314, 320 n.9 (Mich. 1996) (quoting *Harris v. Forklift Sys., Inc.* 510 U.S. 517, 522-23 (1993) (a Title VII case)). Further, unlike the Title VII context, the ELCRA "imposes

16

liability *whenever* sexual harassment creates a hostile work environment[,]" including a single incident "if severe harassment is perpetrated by an employer in a closely knit working environment." *Radtke*, 510 N.W.2d at 168-69 (emphasis in original). In *Radtke*, a single incident of the employer-perpetrator restraining the plaintiff against her will for one minute and attempting to force her to kiss him was sufficient to create a hostile work environment. *Id.* at 168.

With the foregoing in mind, there is no question that Defendant's conduct created a hostile work environment. Plaintiff testified of repeated instances of unwelcome sexual conduct in the form of lifting her shirt and grabbing her breasts, questions about her nipple size, and slapping her buttocks. Plaintiff also testified that during one incident Defendant locked the door to the apartment she was told to clean thereby creating a sense of imprisonment. Plaintiff further testified that Defendant solicited oral sex more than once and involuntarily forced her to touch his privates. The frequency and severity of this conduct all weigh in Plaintiff's favor. Again, the Court finds Plaintiff more credible than Defendant. Further, the conduct was physically threatening and far more than merely offensive utterances. In combination, this unreasonably interfered with Plaintiff's ability to work. Plaintiff testified that she had to modify how she worked by having other employees interrupt when Plaintiff and Defendant were alone. Even assuming the preceding conduct did not establish a hostile work environment, the single incident of oral sex is sufficient under *Radtke* to create a hostile work environment because it was done by the employer in a close knit environment. It is "severe harassment . . . perpetrated" by Defendant, Plaintiff's employer. In the totality of the circumstances, a reasonable person would perceive Defendant's conduct as substantially interfering with Plaintiff's work and that his conduct created an offensive and hostile work environment. Thus, the Court holds there is an actionable claim for hostile work environment under the ELCRA.

*Defendant's conduct was malicious and willful*

Finding that Defendant's conduct amounted to *quid pro quo* sexual harassment under the ELCRA, the Court turns to the question of whether Plaintiff met her burden to show that Defendant acted willfully and maliciously. The Court will first address the malicious prong, in

light of the finding above that Plaintiff has shown an actionable violation of both *quid pro quo* and hostile work environment sexual harassment, and then will discuss the willful element.

<u>Malicious</u>

Several bankruptcy courts, similarly examining whether state court sexual harassment judgments or claims are non-dischargeable under Section 523(a)(6), have held that "malice is inherent in finding that the debtor is liable for sexual harassment." *Busch*, 311 B.R. at 667 (also stating that, "[a]s a matter of law, violations of Title VII [sexual harassment section] will meet the actual malice standard" for Section 523(a)(6) purposes); *Porter*, 363 B.R. at 90 (citation omitted) ("It has been held that malice is inherent in a finding of liability for sexual harassment even where malice is not an element in the applicable sexual harassment statute.").

In *In re Busch*, the bankruptcy court stated: "Because sexual harassment is both illegal and morally reprehensible, it is impossible to conceive of an actionable sexual harassment case [where the defendant's] conduct could be construed as anything other than 'wrongful and without just cause or excuse.'" *In re Busch*, 311 B.R. at 668 (citation omitted). Similarly, another bankruptcy court, after finding the alleged conduct actionable sexual harassment under Title VII, found it "difficult to see how a man's act of grabbing a woman's crotch and touching her breast, in public, without very strong signals from the woman that such conduct was appreciated, would ever be deemed appropriate, mutually enjoyable, 'fun,' and unlikely to produce any injury[.]" *Liccio v. Topakas (In re Topakas)*, 202 B.R. 850, 861 (Bankr. E.D. Pa. 1996). Another bankruptcy court, also in a Section 523(a)(6) sexual harassment case premised on state law, found that "malice, or intent to harm, in a sexual intentional tort is self-evident, either because the tortfeasor knows his conduct is certain or almost certain to cause harm, or because he should know and therefore the intent is inferred as a matter of law." *Halverson*, 226 B.R. at 30 (citing *Johnson v. Miera (In re Miera)*, 926 F. 2d 741 (8th Cir. 1991)).

As discussed above, the trial testimony establishes that Defendant's conduct amounted to an actionable claim for both *quid pro quo* and hostile work environment sexual harassment. Defendant repeatedly engaged in unwelcome and unsolicited sexual contact. Defendant touched Plaintiff inappropriately in numerous ways from slapping her buttocks to grabbing or brushing

up against her breasts. He also commented about Plaintiff's nipple size and, most egregious, forced Plaintiff to engage in oral sex. This conduct "is both illegal and morally reprehensible[.]" It is, as other courts have observed, conduct that is impossible to construe as anything other than wrongful and without just cause or excuse. The Court agrees with the foregoing cited cases that as a matter of law, Plaintiff has established the element of maliciousness for purposes of Section 523(a)(6) because malice is inherent or self-evident in a sexual harassment intentional tort. *Busch*, 311 B.R. at 667.

Independent of the finding that Defendant's conduct constituted actionable sexual harassment and thus was malicious for purposes of Section 523(a)(6), sufficient, independent evidence exists to find that Defendant acted maliciously. Malice means acting in conscious disregard for one's duties or without just cause or excuse. *Brown*, 442 B.R. at 620. Malice can be evident from a defendant's acknowledgment of wrongdoing. *Russell*, 262 B.R. at 455. Some courts also evaluate malice by considering "the likelihood of harm in an objective sense." *Caruso v. Harmon (In re Harmon)*, 404 B.R. 521, 530 (Bankr. W.D. Mo. 2009) (citations and internal quotation marks omitted). Moreover, because, as here, a debtor-defendant will rarely admit to the intent to cause the actual injury, intent "can be inferred through the circumstances surrounding the injury at issue." *In re Sintobin*, 253 B.R. at 831; *In re Halverson*, 226 B.R. at 31 (discussing the "inferred intent standard" applicable in sexual intentional tort contexts).

It cannot seriously be disputed that unwanted sexual contact or forcing another to participate in a sexual act against their will is conduct that is harmful and done without just cause or excuse. Courts have long accepted "the assumption that unwanted sexual contact is harmful . . . ." *Halverson*, 226 B.R. at 30. Other courts have likewise observed this uncontroversial notion. *See*, *e.g.*, *Dorer v. Moberg (In re Moberg)*, 156 B.R. 810, 814 (Bankr. D. Minn. 1993) (where defendant kissed and engaged in sexual intercourse against the will of the plaintiff, malice found "because the nonreciprocal sexual act was substantially certain to cause harm"). Moreover, Defendant did not dispute that he told Plaintiff he knew his conduct was wrong and "against God." Admitting one knows one's conduct is wrong factors into finding the conduct was malicious for purposes of § 523(a)(6). *Harmon*, 404 B.R. at 530. Defendant's knowledge

19

of his wrongdoing demonstrates a conscious disregard of his duties. *In re Russell*, 262 B.R. at 455. Despite Defendant's testimony that he had no intent to injure, the surrounding circumstances permit the inference that he acted maliciously. Whether it be Defendant's testimony at his deposition that on the day the oral sex occurred he told Plaintiff that he was stressed and needed oral sex, or the uncontradicted testimony that Defendant grabbed Plaintiff's breasts or forcibly made Plaintiff touch his privates, these circumstances demonstrate that Defendant desired the sexual acts notwithstanding Plaintiff telling him no. In this regard, Defendant's acts are not dissimilar to those noted in *Harmon* where that court described how defendant forcibly kissed and touched the plaintiff as well as grabbed her hand and make her touch his privates. *Harmon*, 404 B.R. at 530. That court similarly inferred intent to injure because such conduct, "in an objective sense, . . . is highly likely to cause harm." *Id.* Likewise, here Defendant's conduct was objectively very likely to cause Plaintiff harm.

However, as noted earlier, Defendant testified that the oral sex episode was consensual. Consent is not a defense to sexual harassment but can be relevant as to the unwelcome nature of the conduct. *Gebers*, 1995 WL 9262, at * 2. Consent in the context of a sexual harassment case means examining whether the plaintiff engaged in the same type of conduct she complains was offensive. *Pena*, 660 N.W.2d at 355-56. Defendant offered no evidence that Plaintiff engaged in similar conduct. Defendant essentially testified, in various ways, that Plaintiff's mere participation amounted to voluntariness or consent. Defendant also testified that Plaintiff "instigated" the episode. This testimony is in stark contrast to Plaintiff's testimony that she expressly told Defendant she did not want to engage in oral sex and only did so because she felt threatened. Moreover, even though Plaintiff participated in the oral sex, mere acquiescence does not obviate the harm. *Morberg*, 156 B.R. at 814 (fact that plaintiff "ultimately acquiesced in the sexual act" was not relevant to malicious inquiry). Like the court in *Harmon*, faced with the contention that the plaintiff there consented to, asked for, or encouraged the defendant's sexual advances and unwelcome contact, the Court finds Defendant's protestations of consent "self-serving and unbelievable" in light of Plaintiff's testimony.

In summary, because the Court can infer malice from the inherent or self-evident harm in

20

a sexual harassment violation and, independently, because Defendant acted in conscious disregard of his duty or without just cause, the Court holds that Plaintiff has meet her burden to demonstrate by the preponderance of the evidence that Defendant acted maliciously.

<u>Willfulness</u>

Plaintiff must also prove that Defendant acted willfully. In determining whether Defendant acted willfully, the Court's obligation is to determine whether Defendant "desired to cause the consequences" of his actions or that he "believed that the given consequences of his act were substantially certain to result from the act[s]." *Trantham*, 304 B.R. at 307. This requires not just an intentional act that leads to injury, but "the actual intent to cause injury." *Fox,* 370 B.R. at 119. However, the Court is also mindful that, like here, a defendant "will rarely, if ever, admit to acting in a willful . . . manner for purposes of § 523(a)(6)[.]" *Sintobin*, 253 B.R. at 831. A defendant "will almost always be able to come forward with innocent explanations for [his] actions, testifying that 'I did not intend to'" injure the plaintiff. *Russell*, 262 B.R. at 453. Thus, it is necessary to examine "the circumstances surrounding the injury at issue." *Sintobin*, 253 B.R. at 831.

As a preliminary matter, some courts have found that, like the malicious element, the willful element of Section 523(a)(6) can be met upon a finding of a sexual harassment violation. *See*, *e.g.*, *Voss v. Tompkins (In re Tompkins)*, 290 B.R. 194, 199 (Bankr. W.D.N.Y. 2003) (citations omitted) ("Notwithstanding *Geiger*, . . . a finding of sexual harassment . . . falls within the discharge exception for willful and malicious injury."); *Topakas*, 202 B.R. at 861 (adversary proceeding trial testimony regarding sexual harassment by defendant sufficed to meet level of intent required for both willful and malicious conduct). Other courts, however, have found that willfulness is not an element of at least Title VII sexual harassment actions. *Busch*, 311 B.R. at 669. "Although sexual harassment . . . presupposes intentional conduct in the form of unwelcome sexual conduct, it does not require that the [harasser] intend to injure the plaintiff." *Id*. The Court notes that the *Busch* Court specifically rejected what it termed "the minority view" that a willful injury can be found where the defendant was substantially certain the injury would result, an express basis for finding willfulness under the Sixth Circuit's holding in

21

*Markowitz*.  This Court is more persuaded by those cases finding that actionable sexual harassment demonstrates a willful, in addition to malicious, injury.  Here, Plaintiff's testimony regarding the sexual harassment suffices to meet her burden.  As discussed in depth above, Plaintiff testified about the repeated and at times egregious unwelcome and unconsented to touchings by Defendant.  As in *Topakas*, Defendant's conduct was willful because Plaintiff did not solicit or invite the conduct.

Aside from any reliance on the finding of actionable sexual harassment, the trial testimony and evidence demonstrates that Defendant's conduct was "willful."  The "willful" standard has been characterized as "a strict subjective approach."  *S.L. Pierce Agency, Inc. v. Painter (In re Painter)*, 285 B.R. 662, 667 (Bankr. S.D. Ohio 2002) (citing *Carrillo v. Su ( In re Su)*, 290 F.3d 1140 (9th Cir. 2002)).  That is, the inquiry focuses on the consequences the defendant desired to cause or the consequences defendant believed were substantially certain to result.  Defendant testified at trial that the intent to injure Plaintiff "never crossed [his] mind" and he denied any intent to threaten Plaintiff's job or make her depressed.  From Defendant's perspective, the oral sex was voluntary and consensual.  Thus, like most willful and malicious cases, the Court is faced with a defendant who claims neither the desire to cause the consequences, or any belief that the harm was substantially certain to follow.

The Court need not "simply take the debtor's word for his state of mind."  *Su*, 290 F.3d at 1146 n.6.  Rather, this Court properly "may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury producing action." *In re Little*, 335 B.R. at 383 (citation omitted).   This means that where there is an intentional act by a defendant and some level of certainty that the act was substantially certain to case harm, "it is absolutely permissible to infer the ultimate fact of actual intent to cause injury from those evidentiary facts."  *NLRB v. Gordon (In re Gordon)*, 303 B.R 645, 656 n.2 (Bankr. D. Colo. 2003) (citation omitted).  "Depending upon the nature of the act committed and other facts in evidence, to do otherwise may well fly in the face of reason and logic."  *Id*.  While Defendant may be able to testify to a lack of intent, he "will have to deal with any direct or circumstantial evidence which would indicate that he must have had a substantially certain belief that his act

22

would injure, notwithstanding any subjective denial of such knowledge." *Su*, 290 F.3d at 1146 n.6. In cases such as here involving intentional torts, "the circumstantial evidence of the defendant's actual knowledge or belief tends to merge with the evidence supporting a finding of substantial certainty on an objective basis." *Drewes v. Levin (In re Levin)*, 434 B.R. 910, 919 (Bankr. S.D. Fla. 2010).

It is helpful in this regard to consider exactly what Plaintiff's true injury is. The true injury is not the state court settlement or even the depression or post-traumatic stress disorder. These "are only the manifestation[s] of the true injury." *Russell*, 262 B.R. at 454. Plaintiff's true injury is Defendant's "invasion of [Plaintiff's] legally protected right." *Id*. That legally protected right is the right to be free from unwelcome sexual contact. The *In re Russell* court provided the following useful example:

> [I]n a case involving assault and battery, the true injury is not the creditor's broken jaw, but rather, the unconsented to touching that produced the broken jaw. Consequently, the question to ask is not whether the debtor intended to break the creditor's jaw, but instead, whether the debtor intended to hit the creditor.

*Id*. By way of further example, in a case where a defendant-debtor kidnaped his plaintiff-ex-wife and placed her in a garbage can full of snow in a rented storage locker, another court applied *Russell* to determine that the true injury was not the resultant amputated toes from frostbite, "but rather the unconsented to touching that produced the amputated toes." *Larsen v. Jendusa-Nicolai*, 442 B.R. 905, 914-15 *6-7 (E.D. Wis. 2010). The *Larsen* Court then distinguished the reckless or negligent acts in *Geiger*, where the defendant-doctor chose one medical decision over a possibly better medical decision, from those at issue in that case because the actions of placing a person in a garbage can filled with snow and locking them in storage locker "do not have uncertain or variable outcomes." *Id*. at 915. Such acts "are categorically harmful activities." *Id*.

Similarly, here the true injury is the unconsented to and unwelcome sexual contact and solicitations for sexual acts. The Court credits Plaintiff's testimony as to the types and severity of the unwelcome contact over Defendant's bare denials. These acts produced the resulting depression and post-traumatic stress disorder. It is Defendant's acts that caused Plaintiff to seek medical attention and the resulting diagnosis that she was bi-polar. The question to ask in this

23

case then is whether Defendant intended to touch Plaintiff or have her touch him without her consent. The answer is obvious, both from direct and circumstantial evidence. As noted earlier, Defendant agreed with his deposition testimony that on the day of the oral sex episode he told Plaintiff he was stressed and needed oral sex. This is evidence that he intended to have Plaintiff touch him. Plaintiff also testified that Defendant told her to perform oral sex if she valued her job and she did so only because she felt threatened. This is circumstantial evidence of Defendant's intent to intentionally and deliberately cause Plaintiff to perform unconsented to sexual acts. In addition, Plaintiff also testified to numerous and egregious unconsented to contact both before and after the oral sex episode. The unconsented to contact and forcing Plaintiff to perform oral sex or lose her employment "do not have uncertain or variable outcomes" – they "are categorically harmful activities." *Id*. Other courts recognize the inherent and clear harm associated with sexual harassment of this nature. *Halverson*, 226 B.R. at 30; *Moberg*, 156 B.R. at 814. Because Defendant acted intentionally and there is a certainty that the act was substantially certain to cause harm, "it is absolutely permissible to infer the ultimate fact of actual intent to cause injury from those evidentiary facts." *Gordon*, 303 B.R at 656 n.2. Defendant's conduct, "which from a reasonable person's standpoint were substantially certain to result in harm," permits and compels the Court "to infer that [Defendant's] *subjective* intent was to inflict a willful" injury on Plaintiff. *Mann Bracken, LLP v. Powers (In re Powers)*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009) (emphasis in original). Thus, the Court holds that Plaintiff has proven by the preponderance of the evidence that Defendant acted willfully.


Conclusion

Section 523(a)(6) excepts from discharge those debts resulting from a willful and malicious injury caused by a debtor-defendant. Plaintiff has proven by the preponderance of the evidence that Defendant caused a willful and malicious injury. Therefore, Defendant's debt to Plaintiff is non-dischargeable. The Court will enter an order consistent with this opinion.

**Signed on March 29, 2011**

_____/s/ Daniel S. Opperman_____

**Daniel S. Opperman**
**United States Bankruptcy Judge**